*526 WALLACE, Chief Judge:
Chandler and Depweg appeal from a decision of the district court dismissing their action for failure to state a claim. They seek declaratory and injunctive relief and compensatory damages for violation of their First Amendment rights under the United States and Oregon Constitutions. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We reverse and remand.
I
On February 8, 1990, the school teachers in McMinnville, Oregon commenced a lawful strike. In response to the strike, the school district hired replacement teachers. Chandler and Depweg were students at McMinnville High School and their fathers were among the striking teachers. On February 9, 1990, Chandler and Depweg attended school wearing various buttons and stickers on their clothing. Two of the buttons displayed the slogans “I’m not listening scab” and “Do scabs bleed?” Chandler and Depweg distributed similar buttons to some of their classmates.
During a break in the morning classes, a temporary administrator saw Depweg aiming his camera in a hallway as if to take a photograph. The administrator asserted that Depweg had no right to take his photograph without permission and instructed Depweg to accompany him to the vice principal’s office. Chandler witnessed the request and followed Depweg into the office, where they were met by vice principal Whitehead. Whitehead, upon noticing the buttons, asked both students to remove them because they were disruptive. Dep-weg told Whitehead that his morning classes had not been disrupted. A replacement teacher in one of Depweg’s classes confirmed that there had been no disruption. Nonetheless, Whitehead ordered that the buttons be removed. Chandler and Depweg, in the belief that the buttons were protected as a lawful exercise of free speech, refused to comply. They also refused to be separated. Whitehead then suspended them for the remainder of the school day for willful disobedience.
Depweg and Chandler returned to school on February 13, 1990, the next regularly scheduled school day, with different buttons and stickers on their clothing. They each wore a button that read “Scabs” with a line drawn through it (i.e., “no Scabs”), and a sticker that read “Scab we will never forget.” In addition, they displayed buttons with the slogans “Students united for fair settlement,” and “We want our real teachers back.” Approximately 1:45 p.m., assistant vice principal Hyder asked Chandler to remove those buttons and stickers containing the word “scab” because they were disruptive. Chandler, anticipating further disciplinary action, complied with the request.
Chandler and Depweg filed this action in district court, pursuant to 42 U.S.C. § 1983, alleging that the school officials’ reasons for requesting the removal of the buttons were false and pretextual, and therefore violated their First Amendment rights to freedom of expression. They state that the buttons caused no classroom disruption. They further allege that many of their classmates wore the same buttons, but that none were asked to remove them. Chandler and Depweg charge that the school singled them out for punishment, in violation of their First Amendment rights to freedom of association, because they led the student protest against the school district’s decision to hire replacement teachers.
The school district moved to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court granted the motion, stating that the slogans on the buttons were “offensive” and “inherently disruptive.”
II
We review the dismissal of a complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure de novo. Arcade Water Dist. v. United States, 940 F.2d 1265, 1267 (9th Cir. 1991). “Our review is based on the con *527 tents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff.” Hoesterey v. Cathedral City, 945 F.2d 317, 318 (9th Cir.1991) (Hoesterey), cert. denied, — U.S. —, 112 S.Ct. 1941, 118 L.Ed.2d 546 (1992). A court should not grant a motion to dismiss for failure to state a claim unless “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).
A.
We start on agreed ground: students in public schools do not “shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.” Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) (Tinker). “They cannot be punished merely for expressing their personal views on the school premises ... unless school authorities have reason to believe that such expression will ‘substantially interfere with the work of the school or impinge upon the rights of other students.’ ” Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988) (Hazelwood), quoting Tinker, 393 U.S. at 509, 512-13, 89 S.Ct. at 738, 739-40. The schoolroom prepares children for citizenship, and the proper exercise of the First Amendment is a hallmark of citizenship in our country. Nevertheless, this educational experience has its limitations. The First Amendment rights of public school students “are not automatically coextensive with the rights of adults in other settings.” Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 682, 106 S.Ct. 3159, 3163-64, 92 L.Ed.2d 549 (1986) (Fraser). Student preparation for adult experiences does not necessarily ensure adult experiences on the school campus. For example, schools need not tolerate student speech that is inconsistent with the school’s “basic educational mission.” Id. at 685, 106 S.Ct. at 3165; Hazelwood, 484 U.S. at 266, 108 S.Ct. at 567. Despite the fact that the suppression of speech has obvious First Amendment implications, courts are not necessarily in the best position to decide whether speech restrictions are appropriate. “The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board,” and not with the federal courts. See Fraser, 478 U.S. at 683, 685, 106 S.Ct. at 3164, 3165; Hazelwood, 484 U.S. at 267, 108 S.Ct. at 567.
Chandler and Depweg argue that the district court applied an incorrect standard when it dismissed the complaint as a matter of law. They contend that this case is governed by Tinker. In Tinker, junior high school students were suspended for wearing black armbands in protest of the Vietnam war. The Court held that display of the armbands was a “silent, passive expression of opinion, unaccompanied by any disorder or disturbance” and that there was “no evidence whatever of [] interference, actual or nascent, with the schools’ work or of collision with the rights of other students to be secure and to be let alone.” Tinker, 393 U.S. at 508, 89 S.Ct. at 737. The Court explained that “where there is no finding and no showing that engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained.”' Id. at 509, 89 S.Ct. at 738 (internal quotations and citation omitted).
In this case, the district court dismissed the action although there was no allegation of disruption or interference with the rights of other students, relying primarily on Fraser. Fraser involved a speech given by a student at a high school assembly. The speech contained sexual innuendo and metaphor. Fraser, 478 U.S. at 683, 106 S.Ct. at 3164. The Court held that the school district
acted entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech. Unlike the sanctions imposed on the students ... in Tinker, the penalties imposed in this case were unrelated to any political viewpoint. *528 The- First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as [Fraser’s] would undermine the school’s basic educational mission____ Accordingly, it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the “fundamental values” of public school education.
Id. at 685-86, 106 S.Ct. at 3165-66.
The district court also relied upon Fraser ’s distinction of Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). In Cohen, the Court held that a man could not be criminally prosecuted for wearing a jacket bearing an obscene statement disapproving the draft. Id. at 26, 91 S.Ct. at 1788. The Court pointed out that students have “the classroom right to wear Tinker’s armband, but not Cohen’s jacket.” Fraser, 478 U.S. at 682, 106 S.Ct. at 3164 (internal quotations and citation omitted). The district court ruled that the buttons in this case were akin to Cohen's jacket.
Chandler and Depweg argue that Fraser is distinguishable from this case on three grounds. First, they contend that the buttons constituted a “silent, passive expression of opinion” “akin to ‘pure speech.’ ” Tinker, 393 U.S. at 508, 89 S.Ct. at 737. They contrast the silent expression of the buttons with the sexually implicit speech in Fraser. Next, the students focus on the fact that the speech in Fraser was made at a school assembly, a sanctioned school event, whereas their display of the buttons was a passive expression of personal opinion. They cite language in Hazelwood that distinguishes between suppression of “a student’s personal expression that happens to occur on the school premises,” and “educators’ authority over school-sponsored [activities] that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.” Hazelwood, 484 U.S. at 271, 108 S.Ct. at 570. Finally, Chandler and Depweg argue that because their buttons expressed a political viewpoint they are therefore accorded greater protection. They point out that the Court in Fraser distinguished between the lewd speech in Fraser and the political speech in Tinker, thereby implying that restrictions on political speech should be governed by the more exacting Tinker test. Fraser, 478 U.S. at 685, 106 S.Ct. at 3165.
B.
We turn to Hazelwood for guidance in interpreting the meaning and scope of the earlier Tinker and Fraser cases. Hazel-wood involved a dispute over the deletion of two pages of an issue of a school newspaper. The principal deleted the pages because they contained an article addressing students’ experiences with pregnancy, and another article describing the impact of divorce on students at the school. The newspaper was written and edited by students in a journalism class as part of the school’s curriculum. Hazelwood, 484 U.S. at 262-64, 108 S.Ct. at 565-66. The Court declined to apply Tinker, holding instead that “the standard articulated in Tinker for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression.” Id. at 272-73, 108 S.Ct. at 571. The Court then validated discretionary editorial control by school officials over the school-sponsored newspaper “so long as their actions are reasonably related to legitimate pedagogical concerns.” Id. at 273, 108 S.Ct. at 571; see also Planned Parenthood of Southern Nevada v. Clark County School Disk, 941 F.2d 817, 828 (9th Cir. 1991) (en banc) (“first amendment affords educators ‘greater control’ in deciding when the school will affirmatively ‘promote’ or ‘lend its name and resources’ to particular speech”), citing Hazelwood, 484 U.S. at 271-72, 108 S.Ct. at 570.
Although Hazelwood is not directly on point, it is instructive because it interpreted Tinker and Fraser together. The Court pointed out that there is a
difference between the First Amendment analysis applied in Tinker and that applied in Fraser____ The decision in Fraser rested on the “vulgar,” “lewd,” and *529 “plainly offensive” character of a speech delivered at an official school assembly rather than on any propensity of the speech to “materially disrup[t] classwork. or involv[e] substantial disorder or invasion of the rights of others.”
Hazelwood, 484 U.S. at 271 n. 4, 108 S.Ct. at 570 n. 4, quoting Tinker, 393 U.S. at 513, 89 S.Ct. at 740.
We have discerned three distinct areas of student speech from the Supreme Court’s school precedents: (1) vulgar, lewd, obscene, and plainly offensive speech, (2) school-sponsored speech, and (3) speech that falls into neither of these categories. We conclude, as discussed below, that the standard for reviewing the suppression of vulgar, lewd, obscene, and plainly offensive speech is governed by Fraser, 478 U.S. at 683-85, 106 S.Ct. at 3164-65, school-sponsored speech by Hazelwood, 484 U.S. at 273, 108 S.Ct. at 571, and all other speech by Tinker, 393 U.S. at 513-14, 89 S.Ct. at 740-41.
We first address the question of whether school officials may suppress vulgar, lewd, obscene, and plainly offensive speech, even when it is expressed outside the context of an official school program or event. Hazelwood focused on two factors that distinguish Fraser from Tinker: (1) the speech was “ ‘vulgar,’ ‘lewd,’ and ‘plainly offensive,’ ” and (2) it was given at an official school assembly. Hazelwood, 484 U.S. at 271 n. 4, 108 S.Ct. at 570 n. 4. Whereas both of these factors were present in Fraser, we believe the deferential Fraser standard applies when the first factor alone is present. “Surely it is a highly appropriate function of a public school education to prohibit the use of vulgar and offensive terms in public discourse — ” Fraser, 478 U.S. at 683, 106 S.Ct. at 3164. “A school need not tolerate student speech that is inconsistent with its ‘basic educational mission,’ even though the government could not censor similar speech outside the school.” Hazelwood, 484 U.S. at 266, 108 S.Ct. at 567, quoting Fraser, 478 U.S. at 685, 106 S.Ct. at 3165. Therefore, school officials may suppress speech that is vulgar, lewd, obscene, or plainly offensive without a showing that such speech occurred during a school-sponsored event or threatened to “substantially interfere with [the school’s] work.” Tinker, 393 U.S. at 509, 89 S.Ct. at 738. Such language, by definition, may well “impingef ] upon the rights of other students,” id., and therefore its suppression is "reasonably related to legitimate pedagogical concerns.” Hazelwood, 484 U.S. at 272-73, 108 S.Ct. at 570-71.
We turn next to the second category involving speech or speech-related activities that “students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.” In such cases, school officials are entitled to “greater control” over student expression. Id. at 271, 108 S.Ct. at 570. A school has the discretion to “disassociate itself” from an entire range of speech, including “speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences.” Id. (internal quotations omitted). According to Hazelwood, federal courts are to defer to a school’s decision to suppress or punish vulgar, lewd, or plainly offensive speech, and to “disassociate itself” from speech that a reasonable person would view as bearing the imprimatur of the school, when the decision is “reasonably related to legitimate pedagogical concerns.” Id. at 271, 273, 108 S.Ct. at 570, 571.
The third category involves speech that is neither vulgar, lewd', obscene, or plainly offensive, nor bears the imprimatur of the school. To suppress speech in this category, school officials must justify their decision by showing “facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.” Tinker, 393 U.S. at 514, 89 S.Ct. at 740. However, the “First Amendment does not require school officials to wait until disruption actually occurs____ In fact, they have a duty to prevent the occurrence of disturbances.” Karp v. Becken, 477 F.2d 171, 175 (9th Cir.1973).
*530 C.
We now turn to the facts alleged in this case. No effort was made by the school officials to suppress the buttons containing the statements “Students united for fair settlement” or “We want our real teachers back.” Rather, the suppression only involved statements containing the word “scab.” The word “scab,” in the context most applicable to this case, is defined as “a worker who accepts employment or replaces a union worker during a strike.” Webster’s Third New Int’l Dictionary 2022 (unabridged ed.) (1986). Although a dictionary definition may not be determinative in all cases, it is helpful here. “To be sure, the word is most often used as an insult or epithet.” Old Dominion Branch No. 496, Nat’l Ass’n of Letter Carriers v. Austin, 418 U.S. 264, 283, 94 S.Ct. 2770, 2780-81, 41 L.Ed.2d 745 (1974). However, the word is also “common parlance in labor disputes and has specifically been held to be entitled to the protection of § 7 of the NLRA.” Id., citing Linn v. Union Plant Guard Workers, 383 U.S. 53, 60-61, 86 S.Ct. 657, 661-62, 15 L.Ed.2d 582 (1966). Given the requirement to construe the complaint in a light most favorable to Chandler and Depweg, we are satisfied that these buttons cannot be considered per se vulgar, lewd, obscene, or plainly offensive within the meaning of Fraser. At this stage in the litigation, the school officials have made no showing that the word “scab” reasonably could be so considered.
This brings us to the second category of school speech. There is nothing in the complaint alleging that Chandler and Depweg’s buttons reasonably could have been viewed as bearing the imprimatur of the school. The buttons expressed the personal opinion of the students wearing them, and they were displayed in a manner commonly used to convey silently an idea, message, or political opinion to the community. See Burnside v. Byars, 363 F.2d 744, 747 (5th Cir.1966) (Burnside). In addition, they expressed a position on a local political issue that was diametrically opposed to the school district’s decision to hire replacement teachers. Therefore, the complaint does not show that a reasonable person could have viewed the buttons as bearing the imprimatur of the school.
We turn, therefore, to the third category of school speech and its standard: whether the “scab” buttons were properly suppressed because the school officials reasonably forecasted that they would substantially disrupt, or materially interfere with, school activities. Tinker, 393 U.S. at 514, 89 S.Ct. at 740. The district court held that the “scab” buttons were inherently disruptive, but nothing in the complaint or the analysis of the district court substantiates this conclusion. We conclude that the district court erred in holding, without more, that the “scab” buttons were inherently disruptive.
We express no opinion on the question whether, on remand, the school district may be able to meet the reasonable forecast test. We deal with a Rule 12(b)(6) dismissal of a complaint, which may be granted only if Chandler and Depweg could prove no facts to support their claim. That is not the case here because we hold that the “scab” buttons were not inherently disruptive.[1] Although some of the slogans employed by Chandler and Depweg could be interpreted as insulting, disrespectful or even threatening, we must consider the facts in the light most favorable to the *531 students in reviewing the district court’s dismissal of the complaint. Hoesterey, 945 F.2d at 318.
In a case such as this one, where arguably political speech is directed against the very individuals who seek to suppress that speech, school officials do not have limitless discretion. “Courts have a First Amendment responsibility to insure that robust rhetoric ... is not suppressed by prudish failures to distinguish the vigorous from the vulgar.” Thomas v. Board of Educ., Granville Cent. School Dist., 607 F.2d 1043, 1057 (2d Cir.1979) (Newman, J. concurring), cert. denied, 444 U.S. 1081, 100 S.Ct. 1034, 62 L,Ed.2d 765 (1980). Subsequent proof may show that the word “scab” can reasonably be viewed as insulting, and may show that the slogans were directed at the replacement teachers. Such evidence would bear upon the issue of whether the buttons might reasonably have led school officials to forecast substantial disruption to school activities. Mere use of the word “scab,” however, does not establish as a matter of law that the buttons could be suppressed absent the showing set forth above. Perhaps, after trial or summary judgment, the record might support the school officials’ actions. On the basis of the naked complaint, however, this support is absent. The passive expression of a viewpoint in the form of a button worn on one's clothing “is certainly not in the class of those activities which inherently distract students and break down the regimentation of the classroom.” Burnside, 363 F.2d at 748. The district court erred in dismissing the complaint.
Ill
The school district offers a second rationale, based on Oregon law, in support of the dismissal of the complaint. The school district orally raised this issue before the district court. However, the district court did not pass upon this question, and neither will we. See Greater Los Angeles Council on Deafness v. Zolin, 812 F.2d 1103, 1107 (9th Cir.1987).
The school district also contends that Chandler and Depweg should have challenged the constitutionality of the Oregon statute as an overbroad exercise of legislative authority, citing Board of Airport Comm’rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). That case, however, does not require a litigant to challenge facially a statute in order to argue that it was unconstitutionally applied in a particular case. This argument is without merit.
IV
Chandler and Depweg contend that the complaint also states a claim for violation of their First Amendment rights to freedom of assembly and association. The district court never addressed this claim, apparently deciding that it did not survive dismissal of the freedom of speech claim. They contend that the school officials suspended them in order to preclude them from associating with other students and disseminating their views on the strike. The district court should consider this claim on remand.
V
Chandler and Depweg argue that the district court should have asserted pendent jurisdiction over their claim for violation of their civil rights protected by the Oregon Constitution. Assumption of pendent jurisdiction is a matter within the discretion of the trial court. Cook, Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv., 911 F.2d 242, 247 (9th Cir.1990). The district court should consider assertion of pendent jurisdiction over Chandler and Depweg’s state constitutional claims after further evaluating their federal claims.
REVERSED AND REMANDED.

. The concurrence suggests that we lend credence to the notion that there exists a class of “inherently disruptive” words. On the contrary, we merely respond to the district court’s holding that the "scab” buttons were inherently disruptive. The district court stated in its order dismissing Chandler and Depweg's second amended complaint that: "Plaintiffs’ buttons were inherently disruptive.” Order dated Nov. 9, 1990, at 3-4. Chandler and Depweg are appealing from the dismissal of their second amended complaint; the order dismissing that complaint thus forms the basis of this appeal. As such, we address it, and we conclude that the district court erred in holding that the “scab” buttons were inherently disruptive. We cannot simply ignore the district court’s holding. To do so would be to ignore the district court’s rationale for ruling the way it did.
Thus, contrary to the concurrence's stated fear, we are not suggesting that “there exists a subclass of words that are inherently disruptive.”